# United States District Court
## Southern District of Florida
West Palm Beach District

Case Number: **09-82271-CIV-MARRA/JOHNSON**

John Houman
205 North Oak Street
Lantana Florida 33462
john@friendly-banks.com
Plaintiff

FILED by _____ D.C.

JAN 2 6 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

V

Bank of America
Kenneth D Lewis
100 North Tryon St., 18th Fl
Charlotte NC 28255

JPMorgan Chase & Company
Jamie Dimon CEO
270 Park Avenue
New York NY 10017

Bankatlantic Bancorp, Inc.
Alan B Levan CEO
2100 West Cypress Creek Road
Fort Lauderdale FL 33309

Wachovia Bank
John Stumpf CEO
301 South College Street
Charlotte NC 28288

Citibank Corporation
Ditton Andrew CEO
390 Greenwich Street 2nd Floor
New York NY 10013

Wells Fargo & Company
John Stumpf CEO
420 Montgomery Street
San Francisco, California 94104

Defendant's

## Complaint   *second amended complain*

I, John Houman Plaintiff, in the above styled cause sues the defendant's.

| | |
|---|---|
| Bank of America | Kenneth D Lewis |
| Bankatlantic Bancorp, Inc. | Alan B Levan |
| Citibank Corporation | Ditton Andrew |
| JPMorgan Chase & Company | Jamie Dimon |
| Wachovia Bank | John Stumpf |
| Wells Fargo & Company | John Stumpf |

This action is filed under: Title 12 Chapter 41§4001 United States Code & The Check Clearing for the 21st Century Pub. L 108-100

**(Statement of Facts)**

1. The Defendant's have illegally redefined the legal definition of "Unsecured Loan" to exclude **"Negative Checking Balance."**

> By definition a **"Negative Checking Balance"** is an **"Unsecured Loan."** If it is not a loan by definition then why does the banks require us to pay it back.

2. The Defendant's have illegally redefined the Legal definition of **"Overdraft Line of Credit"** to exclude "Negative Checking Balance."

> The Federal Deposit Insurance Corporation Study of Bank Overdraft Programs of November 2008 (FDIC) Page II Foot note #2
>
> **Overdraft lines of credit** (LOCs) are contractual agreements between a bank and a customer stating that the bank will **Lend** up to a specified amount over a defined period to cover overdraft items.

3. The Defendant's have illegally redefined the Legal definition of **"Interest"** to exclude "Over Draft Fees." That **Overdraft Charges** on a negative balance is **"Interest"** and are governed by Federal Banking Laws.

4. That the Defendant's are violating the intent of Check Clearing Act by not passing on saving to customers in the form of reduced fees and still using 2:00 P.M. as the end of a business day.

## A. **Loan Sharking**:

> (FDIC) Page V   9. Assuming a $27 overdraft fee (the survey median), a customer repaying a $20 POS/debit overdraft in two weeks would incur an APR of 3,520 percent; a customer repaying a $60 ATM overdraft in two weeks would incur an APR of 1,173 percent; and a customer repaying a $66 check overdraft in two weeks would incur an APR of 1,067 percent. More rapid repayment of the overdraft amount results in higher APRs, and slower repayment results in lower APRs. 8
>
> Footnote8 These examples assume that the credit extended as a result of the overdraft occurrence equaled the total transaction, that the consumer repaid the credit extended in two weeks, and that no additional fees are imposed on the consumer as a result of the NSF. The APRs were calculated as follows: ((Fee Charged/Amount Financed)*365)/Term (14 days).

## B. **Profiteering:**
Profit by methods considered unethical.

> A. The Bank only cost's after a check is scanned is the overdraft postcard. Around $3.00 shipping & handling. Every thing else is done by computers. (Internet Sources)
>
> B. Daily total overdraft fees' to customers' averages $350.00. (NBC Nightly News).
>
> (FDIC)Page IV
>
> 12. Banks that operated automated overdraft programs had higher NSF-related fee income (measured as a share of operating revenues) compared with other banks. In addition, banks whose automated program covered ATM and/or POS/debit transactions and banks that batch processed transactions largest-to-smallest reported higher fee income than those that did not have these features.

C. **Collusion:** Banks did not get together on creating overdraft fees. But with the advent of debit cards they have shared the information on how to manipulate checking accounts to maximize their Profits.

(FDIC) Page 8
Survey results show that the number of institutions in the study population providing automated overdraft programs has grown rapidly in the past several years. Most study population banks with automated programs (68.4 percent) initiated their program after 2001 (see Table III-4). Large banks were early adopters; more than half (55.4 percent) had an automated program in place by 2001, compared with 41.9 percent of medium banks and 18.2 percent of small banks. In contrast, the majority of study population banks that operated linked accounts and overdraft LOCs already had these programs in place by 2001 (89.4 percent and 85.9 percent, respectively).

(FDIC) Page 11
In batch processing, multiple transactions are bundled into one unit and processed together at some point in the day. All institutions do some level of batch processing, regardless of other primary processing methods used.11 The general batch-processing methods are by check number, by presentation order, by size largest-to-smallest, and by size smallest-to-largest. The order in which transactions are processed can affect overdraft activity, since paying large transactions first could increase the number of overdrafts.12

Footnote 11: For example, even if an institution always processes checks first, before other transactions, rules need to be established for how a group of checks that come in at the same time are processed.

Footnote 12: For example, if a customer has an account with a $50 balance and a total of five items (one item at $100 and four items at $10) are presented against it, the customer will have five overdrawn items in a largest-to-smallest batch process and only one overdrawn item in a smallest-to-largest batch process.

D. **Third Party Vendors**

(FDIC) Page 55. Almost two-thirds (62.9 percent) of study population banks that purchased automated overdraft programs from a vendor used standardized (or off-the-shelf) programs. Most study population banks that used a vendor to manage automated programs (70.6 percent) reported paying third-party vendors a percentage of the fees or income generated by the program, typically 10 to 20 percent.
Small banks and institutions with promoted programs were more likely than other banks to rely on third party vendors to implement and manage the automated overdraft program; purchase and implement a standardized overdraft program; structure vendor compensation based on a percentage of overdraft income generated; and make vendor compensation contingent on a minimum level of income or fees being generated by the use of the product. **When institutions with non promoted programs paid vendors a percentage of income or fees earned, compensation percentages were much higher than those paid by institutions with promoted programs.**

E. **Breach of Contract.** The bank has a **Fiduciary Responsibility** to make available at all times the **Real Time** checking Account Balance. By not informing the Account holder **"Principals"**, his current "Real Time" bank balance. The Bank is in Breach of Contract.

(FDIC) Page III 8. The majority (81.0 percent) of banks operating automated programs allowed overdrafts to take place at automated teller machines (ATMs) and point-of-sale (POS)/debit transactions. However,

most banks whose automated overdraft programs covered ATM and POS/debit transactions informed customers of an NSF only after the transaction had been completed (88.8 percent of banks for POS/debit transactions and 70.7 percent of banks for ATM transactions). A minority of banks (7.9 percent for POS/debit and 23.5 percent for ATMs) did inform consumers that funds were insufficient before transactions were completed at these locations, offering the customers an opportunity to cancel the NSF transaction and avoid a fee.

**Summation:**

A Rose by any other name is still a Rose

A Skunk by any other name still stinks

A loan and interest on that loan by any other name are still governed by Federal Banking Laws and not the banks ( The Fox watching the Hen House)

Previous **"Administration's "** and **"Government Agencies "** have looked the other way while banks have made up their own rules. Now there is a **New Administration** in office that **Demands** everyone to play by the rules. By enforcing Federal Banking Rules that are already on the Books, this can be done in everyone best interest.

**Wherefore:**  1. The Defendant's reprogram their computers to charge interest[1], not fees on a **Negative Checking Balance**.

2. Reduce fees to reflect actual costs.

3. Change business day from 2:00 P.M. to Closing time ever day the bank is open including Saturday, and Clear local check less than $1000.00 the same day if the check is good.

4. Each Defendant to pay the Plaintiff $5,000,000.00 in reparation for time and emotional trauma.

5. Defendant's to pay any & all Plaintiff's Legal and Attorney fees.

6. All upper level **"Bank Officers"** and the **"Board of Director"** of each Company to View <u>100 hours</u> of the Hallmark & Lifetime Chanel's Christmas Movies.

7. Third Party Vendors to be paid a flat fee and not a percentage.

Signed this 26 Day of January 2010

Filer

John Houman
205 North Oak Street
Lantana Florida 33462
561-779-7557
john@ friendly-banks.com

*Signature of Filer*

---

[1] Max 21% on <u>any **Unsecured Loan**</u>, over that is loan-sharking